UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GAIL HORNBUCKLE,

                Plaintiff,        Civil Action No. 13-12785
                                     Honorable John Corbett O'Meara
                                     Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [16, 18]**

Plaintiff Gail Hornbuckle ("Hornbuckle") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [16, 18], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.    RECOMMENDATION**

For the reasons set forth below, the Court finds that the Administrative Law Judge's decision that Hornbuckle is not disabled under the Act is not supported by substantial evidence. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [18] be DENIED, Hornbuckle's Motion for Summary Judgment [16] be GRANTED IN PART to the extent it seeks remand and DENIED IN PART to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. §405(g), this case be REMANDED to the ALJ for

further proceedings consistent with this Recommendation.

## II. REPORT

### A. Procedural History

On April 15, 2010, Hornbuckle filed an application for DIB, alleging a disability onset date of April 2, 2009. (Tr. 115-21). This application was denied initially on July 13, 2010. (Tr. 67-70). Hornbuckle filed a timely request for an administrative hearing, which was held on December 27, 2011, before ALJ Jeanne VanderHeide. (Tr. 26-59). Hornbuckle, who was represented by attorney Michael Plowman, testified at the hearing, as did vocational expert John Stokes. (*Id.*). On February 4, 2012, the ALJ issued a written decision finding that Hornbuckle is not disabled. (Tr. 9-21). On May 6, 2013, the Appeals Council denied review. (Tr. 1-3). Hornbuckle filed for judicial review of the final decision on June 25, 2013. (Doc. #1).

### B. Background

#### *1. Hornbuckle's Disability Reports and Testimony*

At the time of the administrative hearing, Hornbuckle was 51 years old. (Tr. 31). She completed high school and two years of college, taking special education classes. (Tr. 158). She testified that she had always lived with her mother. (Tr. 31-32).

Prior to stopping work, Hornbuckle was employed as a window assembler in a factory. (Tr. 159). In that job, she was required to lift between 50 and 100 pounds and stand during the course of the workday; but, prior to certain automation changes that were implemented, she had no problems doing her job. (Tr. 34). In April of 2009, however, she was fired when the machine she operated was automated and went too fast for her to keep up. (Tr. 33-34, 159).

Hornbuckle indicated that her ability to work is limited by neck and lower back pain, knee pain, seizures, borderline intellectual functioning, and the residual cognitive effects of a cerebellar astrocytoma brain tumor (which was removed when Hornbuckle was four years old).

(Tr. 30, 157).  At the hearing, however, Hornbuckle testified that she was not in any pain on a daily basis (she experienced leg, back, and/or neck pain two or three times a month), and she was not taking any pain medication.  (Tr. 37-39).  She took seizure medication as a child, but had not taken medicine in recent years and had not had a seizure since 1976.  (Tr. 39-40, 168).  Hornbuckle further indicated that she had difficulty with memory, understanding, and following instructions.  (Tr. 47-48, 51, 177).  She explained that the surgery she underwent as a child to remove a brain tumor "affected [her] ability to understand and learn things."  (Tr. 177).

Hornbuckle indicated that she is able to exercise periodically (on a treadmill, stair climber, or stationary bicycle).  (Tr. 32-33, 49).  She is able to care for her own personal needs (including taking showers, doing her hair, and getting dressed), drive, clean the house, prepare meals, shop for groceries, pay bills, balance a checkbook, use a computer, take out the garbage, mow the lawn, shovel snow, and carry laundry baskets.  (Tr. 41-43, 47, 174-75).  In addition, she cares for her mother, who is legally blind.  (Tr. 41-42).  Hornbuckle enjoys taking walks, reading, watching television, and spending time with friends.  (Tr. 44-45, 176).

      2.      *Medical Evidence*

            a.      *Physical Impairments*

The record shows that Hornbuckle has a history of neck and back pain.  An x-ray performed of her lumbar spine in 2006 showed six lumbar-type vertebral body segments; asymmetric disc space narrowing on the right at the L3-L4 level; and facet joint narrowing at L5-L6 and L6-S1, right greater than left.  (Tr. 353).  A thoracic spine x-ray performed at the same time showed mild degenerative changes and mild levoconvex curvature of the thoracic spine.  (Tr. 354).  And, a 2006 x-ray of Hornbuckle's cervical spine showed mild degenerative changes with intervertebral disc space narrowing at C5-C6 and C6-C7, and foraminal narrowing at C5-C6.  (Tr. 358).  A follow-up MRI of Hornbuckle's cervical spine, performed on July 12, 2006,

showed cervical spondylosis (most severe at C3-C4 and C6-C7) and spinal cord flattening. (Tr. 355).

On March 2, 2009, Hornbuckle presented to her primary care physician, Dr. Laura Grima, with complaints of right knee pain. (Tr. 254-55). An x-ray was ordered, which was normal, without any evidence of knee joint effusion, soft tissue abnormality, or radiopaque foreign body. (Tr. 257). In June of 2009, she presented to Henry Ford Wyandotte Hospital after she fell, but x-rays were negative and she was discharged in improved condition. (Tr. 268-70). Moreover, an April 2010 venous Doppler ultrasound of Hornbuckle's right lower extremity was normal. (Tr. 263).

On April 13, 2010, Hornbuckle presented to Dr. Grima, complaining of left knee pain, but reporting that her right knee pain was improved. (Tr. 242). An x-ray of Hornbuckle's left knee performed the next day showed a lucent area within the proximal tibia, possibly projectional. (Tr. 256). As a result, a CT scan of her left leg was performed in May of 2010, which showed a tiny, cortically based lucency in the medial, proximal tibial diaphysis most compatible with a benign entity such as nutrient foramen. (Tr. 295). At a follow-up visit with Dr. Grima on July 12, 2010, Hornbuckle denied any further left knee pain. (Tr. 484).

Dr. Grima's progress notes show that Hornbuckle began to complain of low back pain in August of 2010. (Tr. 291). At that time, she had mild paraspinal muscle spasms, but a lumbosacral x-ray performed on September 1, 2010, was normal. (Tr. 289, 291). Two weeks later, Hornbuckle reported that her back pain had improved. (Tr. 287).

### b. *Mental Impairments*

The record also shows that Hornbuckle has a history of removal of a cerebellar astrocytoma and seizure disorder. School records dating back to 1993 show that she was involved in special education services in school and was considered disabled/handicapped and

4

entitled to special consideration in matters of employment and housing. (Tr. 204-05). However, Hornbuckle reported to Dr. Grima that she had not had a seizure (or taken any seizure medications) since she was a child. (Tr. 487). In addition, Hornbuckle reported that her brain tumor was removed in 1964; after high school, she had no further neurology evaluation or learning testing, as she had "no symptoms" since that time. (*Id.*). Because Hornbuckle reported a history of "borderline mental impairment" and indicated that she had been unable to find a job, Dr. Grima referred her to a neurologist (Dr. G. C. Mangalick) for further evaluation. (*Id.*).

On September 23, 2010, Hornbuckle presented to Dr. Mangalick of the Michigan Neurology Center for evaluation, complaining of clumsiness (worse under stress), recurrent headaches, and forgetfulness. (Tr. 500-01). Dr. Mangalick noted that Hornbuckle was there "mainly to have documentations so she can apply and obtain Social Security Disability status." (Tr. 500). On examination, Hornbuckle had "some difficulty in maintaining her focus and concentration and was somewhat forgetful about recent past events." (*Id.*). However, she was alert, followed commands well, and had normal speech. (*Id.*). Dr. Mangalick stated that, "The findings on this examination are relatively subtle but they will go along with the history that she is status post brain surgery at age five. She still suffers from multiple symptoms, which makes her disabled for continuing employment." (Tr. 501). Dr. Mangalick recommended that Hornbuckle undergo neuropsychological testing and obtain an EEG (because of her history of seizures).[1] (*Id.*).

On September 24 and 28, 2010, Hornbuckle underwent neuropsychological testing with Richard Gelb, Ph.D. (Tr. 428-65). She reported having neurosurgery to remove a brain tumor at

---

[1] An EEG performed on September 29, 2010, was mildly to moderately abnormal. (Tr. 499). The findings indicated "epileptic tendency of mild to moderate severity and of central origin," and further clinical correlation was advised. (*Id.*).

5

age four; prior to that, she had been experiencing epileptic seizures, but they ceased after the surgery. (Tr. 428). She further reported graduating from high school (receiving special education services). (Tr. 428-29). She indicated that she was looking diligently for work on a daily basis, but had not been able to pass "screening tests" for job applications and had received no job offers. (Tr. 429). She also reported having problems with memory. (Tr. 430).

Dr. Gelb administered a variety of tests,[2] including the Weschler Adult Intelligence Scale-III, on which Hornbuckle achieved a valid Full Scale IQ of 68, which is in the Cognitively Impaired range (1st percentile). (*Id.*). Other tests revealed that Hornbuckle had moderate to severe impairment in her ability to define words; moderate to severe impairment in common sense reasoning (1st percentile); and her general fund of information was in the moderate deficit range (2nd percentile). (Tr. 430-31). Her overall reading ability was in the mild to moderate deficit range (3rd percentile); she scored in the moderate deficit range (2nd percentile) on a mental arithmetic task requiring concentration and numerical reasoning skills; her memory recall was in the severe deficit range (below the 1st percentile); and her ability to define words was moderately to severely impaired (1st percentile). (Tr. 431). Dr. Gelb observed that:

> … the neuropsychological test findings appear consistent with long-term cognitive residuals/problems from the brain tumor from childhood. Her pervasive cognitive impairments make it extremely difficult for her to try to function in the work force, as she has difficulty learning new information, has very significant problems knowing what to do if she faces situations that are not identical to what she was previously taught (i.e., cannot think flexibly), and not able to work at a pace equal to others. Also, Ms. Hornbuckle was unable to comprehend instructions to a task that the overwhelming majority of persons understand, which indicates in a work setting, she would likely have difficulty comprehending instructions that are very elementary. She had been let go at her last job

---

[2] Dr. Gelb noted that Hornbuckle "at times needed elaboration of questions or instructions." (Tr. 430). He further indicated that, "During one test, she was unable to comprehend what she needed to do though elaboration of instructions was provided, so the test could not be administered." (*Id.*).

> after the job changed and according to the employer (per Ms. Hornbuckle's report) she was unable to adequately adapt to the changes in technology and speed of the task, which is very consistent with the present assessment findings.

(Tr. 433). Dr. Gelb diagnosed Hornbuckle with dementia and assigned a Global Assessment of Functioning[3] ("GAF") score of 39. (Tr. 434). He encouraged her to apply for DIB, "… as the present assessment findings indicate because of various reasoning, problem solving, memory, and other cognitive deficits described above, she will not be able to [be] successfully employed." (*Id.*). Dr. Gelb concluded his assessment by saying:

> [Hornbuckle] may want to contact Michigan Rehabilitation Services (also known as voc rehab, a state agency) to see if they may be able to offer services to try and train her for a very simple, repetitive job that does not require problem solving, though still this neuropsychologist encourages her to apply for social security disability, as she most likely would have difficulty in being able to develop marketable skills in the work place.

(*Id.*). After reviewing Dr. Gelb's report and Hornbuckle's EEG results, Dr. Mangalick recommended that Hornbuckle apply for DIB and begin taking anti-epileptic medication (because she was losing her insurance, however, she indicated that she could not afford prescription drugs). (Tr. 496).

On October 29, 2010, Lily Go, M.D., completed a Medical Questionnaire on behalf of Dr. Grima. (Tr. 379-80). Dr. Go noted that Hornbuckle's prognosis was poor and opined that she was unable to perform a full-time job on a sustained basis because she suffered from memory loss, limited functioning, and cognitive impairment. (Tr. 380).

### 3. *Vocational Expert's Testimony*

John Stokes testified as an independent vocational expert ("VE"). (Tr. 53-58). The VE

---

[3] GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

characterized Hornbuckle's past relevant work as an assembler as unskilled in nature and ranging from light to heavy in exertion. (Tr. 55). The VE further testified that Hornbuckle's past relevant work as a cashier was unskilled in nature and light in exertion (per the Dictionary of Occupational Titles ("DOT")), but medium as she performed it. (*Id.*). The ALJ then asked the VE to imagine a claimant of Hornbuckle's age, education, and work experience, who was able to perform light work, with the following additional restrictions: no climbing of ladders, ropes, or scaffolds; no use of hazardous machinery or exposure to unprotected heights; limited to occupations that do not require complex written communication; limited to simple, routine, and repetitive tasks; and limited to a low stress job, defined as having only occasional decision-making required, only occasional changes in the work setting or instruction, and an environment free of fast paced production requirements. (Tr. 55-56). The VE testified that the hypothetical individual would be capable of performing Hornbuckle's past relevant work as a cashier (but only as performed per the DOT, not as she performed it). (Tr. 56). The VE also testified that the hypothetical individual would be capable of working in the positions of information clerk (2,400 jobs in the state of Michigan) and office helper (1,500 jobs). (Tr. 57). However, the VE testified that if the hypothetical individual needed to be reminded of job duties and/or instructions several times a day, all competitive employment would be precluded. (Tr. 57-58).

### C. Framework for Disability Determinations

Under the Act, DIB are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A). The Commissioner's regulations provide that a disability is to be

8

determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps …. If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D. The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Hornbuckle is not disabled under the Act. At Step One, the ALJ found that Hornbuckle has not engaged in substantial gainful activity since April 2, 2009, her alleged onset date. (Tr. 11). At Step Two, the ALJ found that Hornbuckle has the following severe impairments: post removal of cerebella astrocytoma brain tumor with residual cognitive mental impairment; seizures; borderline

intellectual functioning; neck and low back problems; and left knee issues. (*Id.*). At Step Three, the ALJ found that Hornbuckle's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment. (Tr. 11-14).

The ALJ then assessed Hornbuckle's residual functional capacity ("RFC"), concluding that she is capable of performing light work, with the following additional restrictions: no climbing of ladders, ropes, or scaffolds; no use of hazardous machinery or exposure to unprotected heights; limited to occupations that do not require complex written communication; limited to simple, routine, and repetitive tasks; and limited to low stress jobs, defined as requiring only occasional decision-making, only occasional changes in the work setting or instruction, and an environment free of fast paced production requirements. (Tr. 14-19).

At Step Four, the ALJ determined that Hornbuckle is able to perform her past relevant work as a cashier, as generally performed per the DOT. (Tr. 19). In the alternative, the ALJ concluded at Step Five, based in part on the VE's testimony, that Hornbuckle is capable of performing a significant number of jobs that exist in the national economy. (Tr. 20). As a result, the ALJ concluded that Hornbuckle is not disabled under the Act. (Tr. 19-21).

### E. Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not

remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

**F.     Analysis**

At Step Three of her analysis, the ALJ concluded that Hornbuckle's "mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.02 and 12.05." (Tr. 12). Before this Court, Hornbuckle advances only one argument: that the ALJ erred in concluding that she does not meet the criteria of Listing 12.05 (Mental Retardation). (Doc. #16 at 8-14). Hornbuckle's Step Three argument is potentially dispositive because an adult whose impairments meet or medically equal the criteria of a Listing is presumed to be under a disability and is granted benefits without further evaluation. *See Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 649 (6th Cir. 2006) (en banc). As set forth in greater detail below, the Court finds that remand is necessary so the ALJ may make a proper determination as to whether Hornbuckle meets Listing 12.05(C)'s requirements.

   *1.     Listing 12.05(C)'s Requirements*

Listing 12.05 describes the criteria necessary to establish disability based on mental retardation. The ALJ's conclusion that Hornbuckle does not meet the criteria of Listing 12.05(C) is at issue in this case. That provision states, in relevant part:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> \*     \*     \*
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.05. Therefore, in order to satisfy Listing 12.05(C), Hornbuckle must show: (1) that she experiences significantly subaverage general intellectual

functioning with deficits in adaptive functioning initially manifested prior to age 22 (i.e., the diagnostic description); (2) that she has a "valid verbal, performance, or full scale IQ of 60 through 70"; and (3) that she suffers from "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *See West v. Comm'r Soc. Sec. Admin.*, 240 F. App'x 692, 697-98 (6th Cir. 2007).

> 2. *The ALJ's Conclusion that Hornbuckle Does Not Meet the Criteria of Listing 12.05(C) is Not Supported by Substantial Evidence*

In this case, the ALJ found that Hornbuckle has a valid full scale IQ of 68, which satisfies the second of the three criteria set forth above. (Tr. 14). However, the ALJ concluded that Hornbuckle did not meet Listing 12.05(C)'s requirement that her "other severe impairments impose an additional and significant work-related limitation of function." (*Id.*). Hornbuckle asserts that this was error because in finding that she suffered from severe impairments (such as neck, back, and knee problems and seizures), the ALJ specifically noted that these impairments "cause significant limitations in [her] ability to perform basic work activities." (Tr. 11). In addition, Hornbuckle asserts that the ALJ's decision is legally deficient because it fails entirely to discuss whether she met Listing 12.05's diagnostic description (i.e., whether she exhibited the requisite deficits in adaptive functioning prior to age 22). (Doc. #16 at 10-11). For the reasons set forth below, the Court finds merit to Hornbuckle's arguments.

> *a. Other Physical or Mental Impairments*

In order to meet the criteria of Listing 12.05(C), in addition to a valid IQ score between 60 and 70, Hornbuckle must show the existence of "a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.05(C). In this case, the ALJ concluded that Hornbuckle does not satisfy this criteria because "the record does not support a finding that any of her other severe

13

impairments impose an additional and significant work-related limitation of function." (Tr. 11, 15). As set forth below, this conclusion is legally erroneous.

As this Court recently explained:

> The additional impairment required at this stage of the analysis "need not be disabling in and of itself," but the Social Security regulations explain that it must be "a 'severe impairment, as defined in §§404.1520(c) and 416.920(c).'" **Based on this regulation, an impairment that is deemed "severe" under 20 C.F.R. §416.920(c) necessarily constitutes a significant additional limitation. Therefore, this prong of the paragraph C criteria is met if the ALJ finds, at Step 2 of the sequential disability analysis, that the claimant suffers from a severe physical or mental impairment that is distinct from the claimant's low IQ.**

*Hutchinson v. Comm'r of Soc. Sec.*, 2013 WL 4604561, at *15 (E.D. Mich. Aug. 29, 2013) (emphasis added) (internal citations omitted). In this case, the ALJ specifically found that, in addition to Hornbuckle's residual cognitive mental impairment and borderline intellectual functioning, she has other severe impairments, including seizures, neck and low back problems, and left knee issues. (Tr. 11). Based on the Social Security Administration's own regulations, "an impairment that is deemed 'severe' necessarily constitutes a significant additional limitation." *Id.* at *15; *see also Oddo v. Astrue*, 2012 WL 7017622, at *4 (N.D. Ohio Dec. 10, 2012). Thus, the ALJ erred in concluding that the "physical or other mental impairment" portion of Listing 12.05(C) was not satisfied.[4]

### b. The Diagnostic Description

As set forth above, the introduction to Listing 12.05 states: "Mental retardation refers to

---

[4] The Commissioner, in her brief, wisely does not argue that this aspect of the ALJ's decision is legally sufficient. Indeed, in addition to the fact that the ALJ found the existence of other severe impairments, her RFC determination includes significant work-related restrictions as a result of Hornbuckle's physical impairments (such as no climbing of ladders, ropes or scaffolds; no use of hazardous machinery; and no exposure to unprotected heights). (Tr. 14). This is further evidence that the ALJ viewed these impairments as imposing additional and significant work-related limitations.

significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.05. While the Commissioner concedes in her brief that the ALJ's discussion of this element of the Listing is "not well-articulated" (Doc. #18 at 9), in actuality, it is missing entirely. Attempting to overcome this omission, the Commissioner argues that the ALJ's discussion of Hornbuckle's daily activities and work history implies that she did not believe Hornbuckle had significant deficits in adaptive functioning; put another way, the Commissioner asserts that any articulation error was harmless because "when read as a whole, the ALJ's decision indicates that she did not believe [Hornbuckle] was sufficiently impaired to be considered disabled." (*Id.* at 8).

As an initial matter, the ALJ's decision is deficient because she fails entirely to discuss whether Hornbuckle meets Listing 12.05's diagnostic description. Without explicitly making the required finding at this initial stage, the ALJ simply proceeded to discuss the "paragraph C" criteria. Therefore, it is unclear whether the ALJ implicitly found that Hornbuckle met the requirements of the introductory paragraph (indeed, why else would there be a need to proceed to subsequent stages of the analysis?) or whether she believed that Hornbuckle had no significant deficits in adaptive functioning (as the Commissioner asserts). As another court faced with a similarly silent "analysis" of this Listing's diagnostic description held, courts "cannot assess whether a finding that [the claimant] does not meet the introductory paragraph is supported by substantial evidence [when] there is no finding by the ALJ on this issue." *Hutchinson*, 2013 WL 4604561, at *14 (citing *Peck v. Barnhart*, 214 F. App'x 730, 736 (10th Cir. 2006)).

In this case, the Commissioner concedes at various points in her brief that the ALJ's diagnostic description analysis was "flawed," "not well-articulated," and "incomplete." (Doc.

15

#18 at 8, 9, 14). However, the Commissioner argues that any such deficiency is harmless because her discussion of Hornbuckle's daily activities and work history – contained elsewhere in the decision – suggests that "she did not believe [Hornbuckle] had deficits in adaptive functioning." (Doc. #18 at 8-9). The Commissioner points out that the ALJ noted that, despite Hornbuckle's alleged limitations, she completed high school and two years of college (taking special education classes); worked in the past as a window assembler; cared for her blind mother; and was able to perform household chores, do yard work, shop, drive, and handle money.[5] (*Id.* at 12 (citing Tr. 12, 18-19)). In summary, the Commissioner asserts, "The evidence cited by the ALJ … shows that the ALJ did not believe that [Hornbuckle] had any significant deficits in adaptive functioning." (*Id.* at 12-13)

---

[5] The Commissioner also argues that, in implicitly concluding that Hornbuckle did not have the requisite deficits in adaptive functioning, the ALJ reasonably discounted Dr. Gelb's opinion that she would not be able to be successfully employed, because that opinion "understated [Hornbuckle's] ability to function and contained internal conflicts." (Doc. #18 at 13-14 (citing Tr. 17-18, 434)). Although the Court need not discuss in detail the ALJ's evaluation of this physician opinion (or others), as it is remanding on other grounds, it notes that the ALJ appears to have unfairly omitted portions of the record that he should have discussed. For instance, the ALJ discounts Dr. Gelb's opinion that Hornbuckle's cognitive impairments would prevent her from successfully maintaining employment because Dr. Gelb purportedly opined that Hornbuckle "might be able to do a very simple, repetitive job that does not require problem solving." (Tr. 17 (citing Tr. 434)). However, a fair reading of Dr. Gelb's opinion does not reveal any such "internal conflicts": Dr. Gelb indicated that Hornbuckle might want to contact the state vocational rehabilitation agency "to see if they may be able to offer services to try and train her for a very simple, repetitive job that does not require problem solving, though still this neuropsychologist encourages her to apply for social security disability, as she most likely would have difficult in being able to develop marketable skills in the work place." (Tr. 434). Similarly, the ALJ discounted Dr. Mangalick's opinion because he "noted 'relatively subtle' physical examination findings." (Tr. 17 (citing Tr. 501)). The entirety of the quoted passage, however, reads as follows: "The findings on this examination are relatively subtle but they will go along with the history that she is status post brain surgery at age five. She still suffers from multiple symptoms, which makes her disabled for continuing employment." (Tr. 501). On remand, while the ALJ certainly need not discuss each and every piece of medical evidence in the record, *Kornecky*, 167 F. App'x at 508; *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x. 661, 665 (6th Cir. 2004), he should fairly and accurately summarize the record evidence; this includes weighing significant pieces of competing evidence, which, if omitted from the ALJ's decision, would distort the meaning of the other information presented therein.

16

There are obvious flaws with the Commissioner's position. First, the Commissioner has not cited any case law in support of her argument that Hornbuckle's current activities of daily living (at age 51) establish that she did not have deficits in adaptive functioning initially manifested during the developmental period (prior to age 22), and the Court is not aware of any such authority. Second, the Commissioner ignores the fact that the record contains significant evidence of deficits in "adaptive functioning," which includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills, prior to age 22. *See West*, 240 F. App'x at 698. For example, Hornbuckle received special education services throughout high school and college, which is evidence of a significant deficit in her functional academic skills. *See Breitenstein v. Astrue*, 2011 WL 1235018, at *13 (S.D. Ohio Jan. 6, 2011) (deficits in functional academic skills relevant in determining whether claimant has deficit in adaptive functioning). Moreover, Hornbuckle has never lived independently, which further evidences deficits in adaptive functioning. (Tr. 31-32). Thus, the record certainly contains some evidence that could support a finding that Hornbuckle meets the diagnostic description of Listing 12.05.

Although the Commissioner invites the Court to consider Hornbuckle's activities of daily living and work history as evidence that she did not demonstrate significant deficits in adaptive functioning prior to age 22, it is simply not for this Court to conduct such an analysis in the first place. In a passage equally applicable on the facts of this case, the *Hutchinson* court noted: "'Though the Commissioner's arguments that [the claimant] does not satisfy the threshold requirement of Listing 12.05 are not entirely unpersuasive, counsel's argument cannot cure a deficient opinion by offering explanations never offered by the ALJ' because 'arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by the [ALJ] rather than counsel's post hoc rationale' that is under the Court's consideration." *Hutchinson*, 2013 WL

17

4604561, at *14 (quoting *Oddo*, 2012 WL 7017622, at *6). In this case, as in *Hutchinson*, because the ALJ's decision is completely silent on this issue, it is unclear whether she conducted the analysis required at the initial step. As a result, the case must be remanded for further consideration of whether Hornbuckle satisfies the diagnostic description of Listing 12.05. *See Peck*, 214 F. App'x at 736 ("If [the claimant] does not meet the capsule definition [in the introductory paragraph], then the ALJ must make that determination in the first instance.").

### III.    CONCLUSION

For foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [18] be DENIED, Hornbuckle's Motion for Summary Judgment [16] be GRANTED IN PART to the extent it seeks remand, and that, pursuant to sentence four of 42 U.S.C. §405(g), this case be REMANDED back to the ALJ for further proceedings consistent with this Recommendation.

Dated: June 17, 2014                               s/David R. Grand
Ann Arbor, Michigan                                DAVID R. GRAND
                                                   United States Magistrate Judge

### NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this

Report and Recommendation.  *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 17, 2014.

                                          s/Eddrey O. Butts
                                          EDDREY O. BUTTS
                                          Case Manager